**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOHN THORPE, RICHARD THORPE,
WILLIAM THORPE, and the SAC and
FOX NATION OF OKLAHOMA,

      Plaintiffs,

          v.

BOROUGH OF JIM THORPE, MICHAEL
SOFRANKO, RONALD CONFER, JOHN
MCGUIRE, JOSEPH MARZEN, W. TODD
MASON, JEREMY MELBER, JUSTIN
YAICH, JOSEPH KREBS, GREG
STRUBINGER, KYLE SHECKLER, and
JOANA KLITSCH,

      Defendants.

CIVIL ACTION NO. 3:CV-10-1317

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are the Borough of Jim Thorpe's (the "Borough") Motion and Cross-Motion for Summary Judgment (Docs. 93; 99) and Plaintiffs the Sac and Fox Nation of Oklahoma, Richard Thorpe, and William Thorpe's (collectively, "Plaintiffs") Motion for Summary Judgment. (Doc. 95.)  Following his death in 1953, legendary athlete Jim Thorpe, an American Indian of Sauk heritage and an enrolled member of the Sac and Fox Nation, was buried in what became known as the Borough of Jim Thorpe, Pennsylvania. The series of events that resulted with the burial of Jim Thorpe in Pennsylvania included an agreement between Jim Thorpe's wife at the time of his death, Patricia Thorpe, and two neighboring municipalities.  The municipalities and Patricia Thorpe agreed, among other terms, that the municipalities would unify and consolidate as the Borough of Jim Thorpe and the remains of Jim Thorpe would be interred in a mausoleum in the Borough.  Dissatisfied with this arrangement, Jim Thorpe's two living sons and the Sac and Fox Nation maintained this action against the Borough and its officers under the Native American Graves Protection and Repatriation Act.

Now, following the close of discovery, Plaintiffs seek summary judgment in their favor

and a declaration that the Native American Graves Protection and Repatriation Act applies to the Borough and the remains of Jim Thorpe. The Borough opposes Plaintiffs' motion and also requests summary judgment in its favor. The Borough argues that the Court lacks jurisdiction to entertain this action pursuant to the "probate exception" to federal jurisdiction. The Borough further asserts that it is not a "museum" under the Native American Graves Protection and Repatriation Act because it never received "Federal funds", or, alternatively, that Plaintiffs' claims are barred by the doctrine of laches. Because the "probate exception" to federal jurisdiction is inapplicable to the instant matter and the Borough did not suffer any prejudice from Plaintiffs' delay in commencing suit, the Borough's motion for summary judgment will be denied. Moreover, because the Borough qualifies as a "museum" for purposes of the Native American Graves Protection and Repatriation Act, Plaintiffs' motion for summary judgment will be granted and the Borough's cross-motion will be denied.

## I. Background

### 1. Factual Background

Legendary athlete Jim Thorpe died on March 28, 1953. (Doc. 98, *Pls.' Statement Material Facts*, "*Pls.' SMF*", ¶ 1; Doc. 100, *Def.'s Ans. Pls.' SMF*, "*Def.'s Answer*", ¶ 1.) Jim Thorpe was an American Indian of Sauk heritage and an enrolled member of the Sac and Fox Nation. (*Id*.) At the time of his death, Jim Thorpe was married to his third wife, Patricia Thorpe. (Doc. 94, *Def.'s Statement Material Facts*, "*Def.'s SMF*", ¶ 10; Doc. 104, *Pls.' Answer to Def.'s SMF*, "*Pls.' Answer*", ¶ 10.) Jim Thorpe was also survived by four daughters and four sons. (*Def.'s SMF*, ¶¶ 14-15; *Pls.' Answer*, ¶¶ 14-15.) When he died, Jim Thorpe's residence was in Lomita, California. (*Def.'s SMF*, 11; *Pls.' Answer*, 11.) Today, Plaintiffs Richard and William Thorpe are Jim Thorpe's sole surviving children. (*Pls.' SMF*, ¶ 2; *Def.'s Answer*, ¶ 2.)

Following Jim Thorpe's death, traditional Sac and Fox funeral and burial rites were

commenced, but were interrupted and never completed. (*Pls.' SMF*, ¶ 5.) Jim Thorpe died intestate, and his estate was assigned to Patricia Thorpe, his surviving spouse. (*Def.'s SMF*, Ex. C, 10.)

Subsequently, Patricia Thorpe entered into an agreement dated May 19, 1954 with the Boroughs of Mauch Chunk and East Mauch Chunk that set forth terms and conditions for the renaming of the municipalities and the interment of Jim Thorpe. (*Defs. SMF*, ¶ 20.) As part of the Agreement, the municipalities were consolidated under the name "Jim Thorpe." (*Id.* at ¶ 21.) The Agreement provided that Patricia Thorpe, her heirs, administrators and executors would not remove or cause to be removed the body of Jim Thorpe, and such obligations were binding "upon the first party and upon her heirs, administrators and executors only for so long as the boroughs of East Mauch Chunk and Mauch Chunk, parties hereto, are officially known and designated as 'Jim Thorpe.'" (*Id.* at ¶ 23, Ex. D.) Individual Plaintiffs and the Sac and Fox Nation, however, were not parties to the Agreement. (*Pls.' SMF*, ¶ 6; *Def.'s Answer*, ¶ 6.) Pursuant to the Agreement, Jim Thorpe's remains were interred within the Borough, and the remains continue to be interred on Borough-owned land in a mausoleum maintained by the Borough. (*Def.'s SMF*, ¶¶ 25-26; *Pls.' Answer*, ¶¶ 25-26; *Pls.' SMF*, ¶ 7; *Def.'s Answer*, ¶ 7.) Mauch Chunk and East Mauch Chunk changed their identity to that of a single Borough under the name of Jim Thorpe, and the Borough has maintained the interment site for the last fifty-five years. (*Def.'s SMF*, ¶¶ 27-31; *Pls.' Answer*, ¶¶ 27-31.)

Plaintiff William Thorpe has been aware that his father was buried in the Borough since the 1950s. (*Def.'s SMF*, ¶ 34; *Pls.' Answer*, ¶ 34.) William and his brothers contemplated filing a lawsuit back in the 1950s or 1960s but did not because of a difference of opinion with their half sisters. (*Def.'s SMF*, ¶ 35.) William Thorpe also had discussions about commencing an action under the Native American Graves Protection and

Repatriation Act in the early 1990s, but no action was brought at that time. (*Id*. at ¶ 41, (citing *William Thorpe Dep. Tr.*, 34:13-25).)

Plaintiff Richard Thorpe learned that his father was buried in Pennsylvania years ago by reading the newspaper. (*Id*. at ¶ 42 (citing *Richard Thorpe Dep. Tr.*, 22:20-23:4).) Approximately fifteen or sixteen years ago, Richard Thorpe visited his father's burial site in Pennsylvania. (*Id*. at ¶ 43.)

## B.    Procedural History

John Thorpe filed a complaint against the Defendants on June 24, 2010. Defendants moved to dismiss the complaint on August 23, 2010; the motion was granted in part and denied in part in an order issued February 4, 2011. John Thorpe's claim under § 1983 was dismissed, but he was allowed to proceed with his claim under the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. §§ 3001 to 3013. Further, he was ordered to join all necessary parties in an amended complaint or to submit evidence and briefing showing that joinder of any or all of the necessary parties was not feasible and that the action could proceed in "equity and good conscience" under Rule 19(b).

On February 22, 2011, John Thorpe died, and the proceedings were stayed for sixty-seven days. Counsel for John Thorpe filed an amended complaint on May 2, 2011, adding as Plaintiffs Richard and William Thorpe, the sole surviving sons of Jim Thorpe, and the Sac and Fox Nation. The First Amended Complaint re-alleged Plaintiffs' § 1983 claims to preserve them for appeal and also set forth a claim under the Equal Access to Justice Act, 28 U.S.C. § 2412(b). The Borough filed a motion to dismiss the amended complaint on May 20, 2011, and then another motion to dismiss on other grounds on June 16, 2011. The individual Defendants filed a motion to dismiss the amended complaint on May 20, 2011, and then another motion to dismiss on other grounds on June 22, 2011. On November 23, 2011, Defendants' motions to dismiss were granted in part, and Plaintiffs' §

1983 and Equal Access to Justice Act claims were dismissed. However, I further determined that Jim Thorpe's lineal descendants were not necessary parties to this action under Rule 19. Plaintiffs were also granted leave to file an amended pleading

On December 13, 2011, Plaintiffs filed a Second Amended Complaint seeking permanent injunctive relief requiring the Borough to comply with the NAGPRA, declarations that the Borough is a "museum" as defined by the NAGPRA and in violation of the statute's requirements, and a judgment for attorney's fees and costs. The Borough filed its Answer and Affirmative Defenses to the Second Amended Complaint on January 25, 2012.[1]

The action proceeded to discovery. On December 31, 2012, the Borough and Plaintiffs both filed motions for summary judgment. (Docs. 93; 95.) The Borough, on January 18, 2013, filed its opposition to Plaintiffs' motion for summary judgment and a "cross-motion for summary judgment." (Doc. 99.) On January 24, 2013, Plaintiffs' response to the Borough's motion for summary judgment was filed. (Doc. 105.)[2] On February 4,

---

[1]     On December 28, 2011, individual Defendants were granted until January 26, 2012 to respond to Plaintiffs' Second Amended Complaint. (Doc. 74.) It appears from the docket that no response was filed.

[2]     The Borough contends that Plaintiffs' response filed on January 24, 2013 was untimely. (Doc. 108, 1 n.1.) "A brief in opposition to a motion for summary judgment and L.R. 56.1 responsive statement, . . . shall be filed within twenty-one (21) days after service of the movant's brief." M.D. Pa. Local Rule 7.6. While not specified by the Borough, the Borough's submission implies that Plaintiffs' response was due on or before January 22, 2013 (as January 21, 2013 was a "legal holiday"). *See* Fed. R. Civ. P. 6(a)(1)(C); *see also* Fed. R. Civ. P. 6(a)(6). However, Rule 6(d) provides that "[w]hen a party may or must act within a specified time after service and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a)." Fed. R. Civ. P. 6(d). Here, the Borough served its motion for summary judgment and supporting documents on December 31, 2012 "by electronic service pursuant to the ECF system." (Doc. 97.) Because service of the Borough's motion was made by electronic means under Rule 5(b)(2)(E), three days were added to January 22, 2013, resulting in a response deadline of January 25, 2013. Plaintiffs' response filed on January 24, 2013 was therefore timely.

5

2013, Plaintiffs filed their reply brief to the Borough's response and cross-motion for summary judgment. (Doc. 107.) Lastly, on February 5, 2013, the Borough filed a reply brief to Plaintiffs' response to its summary judgment motion. (Doc. 108.) The motions for summary judgment are therefore fully briefed and ripe for disposition.

## II. Discussion

### A. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983). The moving party

may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Where cross-motions for summary judgment are filed, as is the case here, the

summary judgment standard remains the same. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). Of course, when presented with cross motions for summary judgment, the Court must and does consider the motions separately. *See Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994).

## B.  Summary Judgment Motions

### 1.  The Borough's Motion and Cross-Motion

As noted, the Borough filed its summary judgment motion on December 31, 2012. The Borough asserts that the Court lacks jurisdiction to resolve Plaintiffs' request for relief pursuant to the "probate exception" to federal jurisdiction. Furthermore, the Borough maintains that Plaintiffs' request for equitable relief under the NAGPRA is barred by the doctrine of laches. Additionally, in its cross-motion for summary judgment, the Borough argues that it only benefitted from "Federal funds" since the enactment of the NAGPRA. As a result, the Borough contends that it is not a "museum" for purposes of the statute.

### 2.  Plaintiffs' Motion

Plaintiffs' motion for summary judgment was also filed on December 31, 2012. Specifically, Plaintiffs seek a declaration that the NAGPRA applies to the Borough and to the remains of Jim Thorpe.[3] Plaintiffs further request a declaration that the Borough must comply with the repatriation provisions of the NAGPRA. In support, Plaintiffs contend that the provisions of the NAGPRA apply in this case because: (1) the Borough has control and possession over Jim Thorpe's remains; (2) the Borough is a "museum" under the NAGPRA since it received "Federal funds"; and (3) the Borough has no legal claim under the NAGPRA or otherwise to retain Jim Thorpe's remains. And, according to Plaintiffs, as there

---

[3]     In opposition to Plaintiffs' motion for summary judgment, the Borough asserts that Plaintiffs are required to establish the four equitable elements for entry of an injunction. Plaintiffs respond by emphasizing that they have only sought a declaration as to the applicability of the NAGPRA. (Doc. 107, 17-20.)

are no material facts in dispute regarding their entitlement to invoke the NAGPRA, summary judgment in their favor is appropriate.

**C.    Analysis**

**1.    The "Probate Exception" Does Not Bar Jurisdiction**

The Borough's threshold argument in moving for summary judgment is that the "probate exception" to federal jurisdiction bars the Court from entertaining Plaintiffs' request for relief.    According to the Borough, federal courts lack power "to exercise *in rem* jurisdiction over probate property (including remains by extension) that had previously been validly adjudicated by another court." (Doc. 96, 8.)  The Borough further maintains that "Plaintiffs are attempting to overrule, undermine, and challenge the surviving spouse/executrix's and California Court's decision from 60 years ago without returning to that Court for relief." (Doc. 108, 13.)

Plaintiffs dispute the relevance of the "probate exception" to bar jurisdiction over their claims under the NAGRPA.  Specifically, Plaintiffs assert that the Borough fails to recognize that human remains are not part of a decedent's probate estate. (Doc. 105, 6.) Furthermore, as this case does not raise any issues with respect "to any will or administration of Jim Thorpe's estate or distribution of any property," (Doc. 98, 34 n.54), Plaintiffs argue that the "probate exception" is inapplicable to this action.

The "probate exception" to federal jurisdiction is not "compelled by the text of the Constitution or federal statute," but is instead a "doctrine[ ] stemming in large measure from misty understandings of English legal history." *Marshall v. Marshall*, 547 U.S. 293, 300, 126 S. Ct. 1735, 164 L. Ed. 2d (2006).  Under the exception, a federal court "has no jurisdiction to probate a will or administer an estate." *Markham v. Allen*, 326 U.S. 490, 494, 66 S. Ct. 296, 90 L. Ed. 256 (1946).  In *Markham*, however, the Court recognized that the "probate exception" does not bar a federal court from exercising jurisdiction over all claims related

9

to such a proceeding:

> [F]ederal courts of equity have jurisdiction to entertain suits 'in favor of creditors, legatees and heirs' and other claimants against a decedent's estate 'to establish their claims' so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction over the probate or control of the property in the custody of the state court.
>
> Similarly while a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court, it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court.

*Id*. (citations and internal citations omitted).

Sixty years later, the Supreme Court indicated concern with lower courts' interpretation of *Markham*, as some courts "puzzled over the meaning of the words 'interfere with the probate proceedings,' and some . . . read those words to block federal jurisdiction over a range of matters well beyond probate of a will or administration of a decedent's estate." *Marshall*, 547 U.S. at 311, 126 S. Ct. 1735. The Court interpreted "*Markham*'s enigmatic words, in sync with the second above-quoted passage, to proscribe 'disturb[ing] or affect[ing] the possession of property in the custody of a state court.'" *Id*. at 311, 126 S. Ct. 1735. *Marshall* thus clarified the scope of the "probate exception" to federal jurisdiction:

> [W]e comprehend the "interference" language in *Markham* as essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*. Thus, the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Id.* at 311-12, 126 S. Ct. 1735.

Following *Marshall*, the "probate exception" applies only when a federal court is endeavoring to "(1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court." *Three Keys Ltd. v. SR Util. Holding Co.*, 540 F.3d 220, 227 (3d Cir. 2008).

10

For several reasons, the "probate exception" to federal jurisdiction is inapplicable to this case.  Initially, neither the Supreme Court nor the Third Circuit has determined that there exists an uncodified exception to a federal court's jurisdiction over an enforcement action under the NAGPRA. *Cf. Marshall*, 547 U.S. at 308-09, 126 S. Ct. 1735 ("We therefore need not consider in this case whether there exists any uncodified probate exception to federal bankruptcy jurisdiction under § 1334.").  Likewise, there have been no decisions from other federal courts addressing the applicability of the "probate exception" to claims under the NAGPRA.  Moreover, it is uncertain if the "probate exception" "even applies to federal question cases." *See United States v. Tyler*, No. 10-1239, 2012 WL 848239, at *4 (E.D. Pa. Mar. 13, 2012) (comparing *Jones v. Brennan*, 465 F.3d 304, 306 (7th Cir. 2006) (probate exception applicable to both federal question and diversity cases); *Tonti v. Petropoulous*, 656 F.2d 212, 215–16 (6th Cir. 1981) (same), with *In re Goerg*, 844 F.2d 1562, 1565 (11th Cir. 1988) (probate exception applicable only to diversity cases)).[4] While this issue has not been addressed by the Third Circuit, the exception has been described "as an 'exception to diversity jurisdiction.'" *Id*. (quoting *Three Keys*, 540 F.3d at 222, 226, 227; *Golden ex. rel. Golden v. Golden*, 382 F.3d 348, 352, 354, 357 (3d Cir. 2004); *Marshall v. Lauriault*, 372 F.3d 175, 179–82 (3d Cir. 2004); *Moore v. Graybeal*, 843 F.2d 706, 709 (3d Cir. 1988)).  And, the "domestic relations exception," a jurisdictional limitation closely related to the "probate exception," "does not apply in federal question cases." *Id*. (citing *Flood v. Braaten*, 727 F.2d 303, 307 (3d Cir. 1984) ("[T]he domestic relations exception *per se* applies only to actions in diversity.")).

---

[4]     The Ninth Circuit also found the "probate exception" applicable to both federal question and diversity cases. *In re Marshall*, 392 F.3d 1118, 1131–32 (9th Cir. 2004).  The Supreme Court reversed on other grounds without considering "whether there exists any uncodified probate exception to federal bankruptcy jurisdiction." *Marshall*, 547 U.S. at 308-09, 126 S. Ct. 1735.

Even if the "probate exception" applies to claims under the NAGPRA, however, the Borough has failed to establish that the claims in this action fall under any of the prohibitions to federal jurisdiction identified by the Supreme Court in *Marshall* or the Third Circuit in *Three Keys*.

First, this action does not implicate the "probate or annulment of a will," as Jim Thorpe died without a will. *See Marshall*, 547 U.S. at 311-12, 126 S. Ct. 1735.

Second, the instant dispute does not involve a request for this Court to administer Jim Thorpe's estate. *See Marshall*, 547 U.S. at 311-12, 126 S. Ct. 1735. "The basic purposes of administering a decedent's estate are to preserve and protect the estate; to satisfy and discharge all debts and claims, including expenses of administration, that are charges or liens on the property; and to distribute the residue of the property, at a proper time, to those persons who are entitled to receive it." *Estate of Jiminez*, 65 Cal. Rptr. 2d 710, 714 (Cal. Ct. App. 1997). Estate administration thus involves "ascertaining the nature, extent, and total value of the decedent's property and transferring it to the proper persons, who include creditors and taxing authorities as well as heirs." *In re Estate of Bonanno*, 80 Cal Rptr. 3d 560, 567 (Cal. Ct. App. 2008). Here, Plaintiffs' claims do not require the Court to ascertain the nature or extent of Jim Thorpe's estate or otherwise distribute or transfer estate property.

Third, contrary to the claims of the Borough, Plaintiffs do not seek to have the Court assume *in rem* jurisdiction over property that is in the custody of a probate court. *See Marshall*, 547 U.S. at 311-12, 126 S. Ct. 1735. Indeed, the Borough's arguments that Jim Thorpe's remains are probate property and disputes over his remains must be raised in a California probate court are nearly identical to those rejected in *Estate of Jiminez*. In that case, a dispute among heirs was brought in a probate court concerning the decedent's wishes for her burial. *See Estate of Jiminez*, 65 Cal. Rptr. 2d at 712. While the decedent

left a will, it did not contain any instructions concerning disposition of her remains. *See id.* at 711. The probate court dismissed the petition on the ground that the dispute over the disposition of remains was not within the jurisdiction of the probate court. *See id.*

The California Court of Appeal affirmed the probate court's order of dismissal. *See id.* Significantly, the court recognized that "[t]he body of one whose estate is in probate unquestionably forms no part of the property of that estate." *Id.* at 714 (Cal. Ct. App. 1997); *see also Kulp v. Kulp*, 920 A.2d 867, 872 (Section 305 of the Probate, Estates, and Fiduciaries Code supports the position "that the right to dispose of a decedent's remains is not a property right"); *Wynkoop v. Wynkoop*, 42 Pa. 293, 1861 WL 5846 (Pa. 1862) ("There is no right of property in such [human] remains, from their very nature."). The court further rejected the claim that Health and Safety Code section 7100 empowered a probate court to enforce its provisions.[5] Rather, because section 7100 relates only to "initial burial decisions" and its "provisions are not located in the Probate Code, they do not specifically empower the probate court to enforce them." *Estate of Jiminez*, 65 Cal. Rptr. 2d at 713 (quoting *Walker v. Konitzer*, 31 Cal. Rptr. 906 (Cal. Ct. App. 1963)). Accordingly, "where the decedent's wishes are not contained in the will itself, a dispute over disposition of the remains belongs in the civil court, not probate." *Id.* at 715. Moreover, "the fact that the question of disinterment is said to be a matter for the court sitting in equity further tends to suggest that a request, if not based on the terms of the will itself, is not a probate matter." *Id.* at 715 (internal citations omitted).

Consistent with California law, and the law generally, the body of one whose estate is in probate is not part of the property of the estate. *See, e.g.*, 22A Am. Jur. 2d *Dead Bodies* § 3 (2013) ("At common law, there is no property right in the body of a deceased

---

[5]     Section 7100 governs the right to control the disposition of the remains of a
        deceased person. *See* Cal. Health & Safety Code § 7100 (2013).

13

person," and "the body of a deceased forms no part of the property of one's estate in the usual sense, as do other chattels or property."). Therefore, Jim Thorpe's remains were not estate property in custody of a California probate court. Plaintiffs' claims, as a result, do not endeavor to have the Court "assume *in rem* jurisdiction over property that is in the custody of the probate court," *Three Keys*, 540 F.3d at 227, or involve "disturbing or affecting the possession of property in the custody of a state court." *Marshall*, 547 U.S. at 311, 126 S. Ct. 1735.[6]

In accordance with *Marshall*, Plaintiffs' claims fall "outside the bounds of the probate exception." *Marshall*, 547 U.S. at 308, 126 S. Ct. 1735. The Borough's motion for summary judgment pursuant to the "probate exception" to federal jurisdiction will therefore be denied.

## 2. Applicability of the NAGPRA to the Borough

### a. Overview of the NAGPRA

Congress passed the Native American Graves Protection and Repatriation Act, codified at 25 U.S.C. §§ 3001–3013, in 1990 "to strengthen federal protection of Native American burial sites and to enable tribes to pursue the recovery of sensitive materials in museum collections." Martin Sullivan, *A Museum Perspective on Repatriation: Issues & Opportunities*, 24 Ariz. St. L.J. 283, 283 (1992) (citing 25 U.S.C. §§ 3001–3013).

The NAGPRA protects Native American "cultural items," which include human remains, funerary objects, sacred objects, and objects of cultural patrimony. 25 U.S.C. § 3001(3)(A)-(D). The NAGPRA gives Native Americans an interest of ownership or control in Native American cultural items in two circumstances. *See* H.R. Rep. No. 101-877, at 8–9 (1990). First, it gives a right to repatriation of Native American cultural items- including human remains- that are excavated or discovered on federal or tribal lands. *Id.* Second,

---

[6]     And, contrary to the Borough's suggestion, Plaintiffs were not required to bring their claims in a California probate court as a result of section 7100. As Plaintiffs note, pursuant to *Estate of Jiminez*, had they brought their claims in a probate court, the action would necessarily have been dismissed for lack of jurisdiction.

the act gives a right of repatriation when these items are possessed or controlled by museums or federal agencies. *Id.*[7]

At issue in this case are the museum provisions, which address Native American cultural items- including human remains- possessed or controlled by a museum or federal agency. *See* 25 U.S.C. § 3002–3008. A "museum" is defined as:

> any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items. Such term does not include the Smithsonian Institution or any other Federal agency.

25 U.S.C. § 3001(8).

Museums and federal agencies which have "possession or control over holdings or collections of Native American human remains and associated funerary objects shall compile an inventory of such items and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item." *Id.* at § 3003.[8] Once the cultural affiliation of Native American human remains is established, a lineal descendant of the Native American or the tribe may request the return of the remains. *Id.* at § 3005(a).

---

[7]    Consistent with these objectives, the NAGPRA provisions can be divided into two groups: the "discovery" provision, and the "museum" provisions. The discovery provision relates to Native American human remains, funerary objects, sacred objects and objects of cultural patrimony that are excavated or discovered on Federal or tribal lands after November 16, 1990. *See* 25 U.S.C. § 3002. The discovery portion of the NAGPRA is not at issue in this case.

[8]    "Native American human remains" is not statutorily defined. However, the implementing regulations promulgated by the Secretary of the Interior define "human remains" as "the physical remains of the body of a person of Native American ancestry. The term does not include remains or portions of remains that may reasonably be determined to have been freely given or naturally shed by the individual from whose body they were obtained, such as hair made into ropes or nets." 43 C.F.R. 10.2(d)(1). It is undisputed that Jim Thorpe was an American Indian of Sauk heritage and an enrolled member of the Sac and Fox Nation. (*Pls.' SMF*, ¶ 1; *Def.'s Answer*, ¶ 1.) I previously determined that "Native American human remains" "plainly encompasses the remains of Jim Thorpe." (Doc. 22, 21.)

15

Congress provided that the Secretary of the Interior would establish a committee of seven members to review and make findings related to the repatriation of cultural items "upon the request of any affected party." 25 U.S.C. § 3006(c)(3). Additionally, the committee is responsible for "facilitating the resolution among . . . lineal descendants and Federal agencies or museums relating to the return of such items including convening the parties to the dispute if deemed desirable." *Id.* at § 3006(c)(4). The records and findings the review committee makes relating to the repatriation of human remains may be admissible in an action brought under the NAGPRA. *Id.* at § 3006(d).

The NAGPRA provides lineal descendants with a right to request their ancestors' remains, and they can avail themselves of a private right of action to enforce the repatriation provisions. (Doc. 22, 15 (citing 25 U.S.C. § 3002(a)(1); 25 U.S.C. § 3013).) Indeed, when disputes under the NAGPRA arise, "[t]he United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter." 25 U.S.C. § 3013.

### b. The Borough is a "Museum" Under the NAGPRA

The applicability of the NAGPRA to the Borough depends on whether the Borough qualifies as a "museum" under the statute. (Doc. 22, 19-22.) Here, the Borough does not dispute that it has possession or control over the remains of Jim Thorpe "like a cemetery has control of remains buried within its lot." (Doc. 101, 4.) Nor does the Borough contest that Jim Thorpe was a Native American or a member of the Sac and Fox Nation. (*Def.'s Answer*, ¶ 1.) Thus, the Borough's status as a "museum" for purposes of the NAGPRA depends on whether it "receive[d] Federal funds." 25 U.S.C. § 3001(8).

Plaintiffs claim that the Borough was the recipient of "Federal funds" in at least the following instances: (1) a federal grant under the American Recovery and Reinvestment Act of 2009 ("ARRA"), which was administered by the Pennsylvania Infrastructure Investment Authority ("PENNVEST") and was awarded to fund the replacement of water meters within

the Borough (Doc. 98, Ex. 5, "013", "019"); (2) federal relief grants from the Federal Emergency Management Agency ("FEMA"), which, although administered by the Pennsylvania Emergency Management Agency ("PEMA"), the "federal share" of the payment was approved by FEMA (Doc. 98, Ex. 6, "004"; Ex. 15, "009"); (3) yearly grants funded by the United States Department of Housing and Urban Development's Community Development Block Grant ("CDBG") program, which were administered by the Carbon County Office of Planning and Development, totaling $787,965.00 to the Borough for 2005-2011 (Doc. 98, Ex. 7, "001", "016", "027", "038", "045", "053", "060", "068"); (4) a Bond Purchase Agreement administered by PENNVEST to finance construction of improvements to the Borough's public water system facilities (Doc. 98, Ex. 5, "001", "004", "079-122"); and (5) other water and sewer related projects administered by PENNVEST. (Doc. 98, Ex. 5, "001".)

The Borough has not questioned the authenticity of the documentation submitted by Plaintiffs. However, the Borough disputes the characterization of these funds as "Federal" for purposes of the NAGPRA since these funds were received by the Borough from agencies of the Commonwealth or Carbon County.

The phrase "receives Federal funds" is not defined by statute. NAGPRA's regulations, however, provide:

> The phrase "receives Federal funds" means the receipt of funds by a museum after November 16, 1990, from a Federal agency through any grant, loan, contract (other than a procurement contract), or other arrangement by which a Federal agency makes or made available to a museum aid in the form of funds. Federal funds provided for any purpose that are received by a larger entity of which the museum is a part are considered Federal funds for the purposes of these regulations. For example, if a museum is a part of a State or local government or a private university and the State or local government or private university receives Federal funds for any purpose, the museum is considered to receive Federal funds for the purpose of these regulations.

43 C.F.R. § 10.2(a)(3)(iii). Pursuant to this definition, Plaintiffs assert that the NAGPRA's "Federal funds" requirement can be satisfied by direct or indirect receipt of funds from the

Federal Government. Satisfaction of the "Federal funds" requirement through indirect funding, Plaintiffs contend, is permissible and consistent with the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 104 S. Ct. 1211, 79 L. Ed. 2d 516 (1982).

*Grove City* addressed the prohibition on sex discrimination in educational programs receiving "Federal financial assistance" under Section 901(a) of Title IX of the Education Amendments of 1972. *Grove City*, 465 U.S. at 557, 104 S. Ct. 1211.[9] Among other issues before the Court was "whether Title IX applies at all to Grove City College, which accepts no direct assistance but enrolls students who receive federal grants that must be used for educational purposes." *Id*. at 558, 104 S. Ct. 1211. Based on its desire to avoid federal oversight, Grove City, a private, coeducational college, declined to participate in direct institutional aid programs and federal student assistance programs. *See id*. at 559, 104 S. Ct. 1211. However, the College enrolled a large number of students who received federal grants that were used to pay for their education. *See id*. The College nonetheless argued that it did not receive federal financial assistance within the meaning of Title IX simply because some of its students received federal grants to fund their tuition and pay for their education. *See id*. at 563, 104 S. Ct. 1211.

According to the Supreme Court, "Grove City's argument that none of its programs receives any federal assistance is a perceived distinction between direct and indirect aid, a distinction that finds no support in the text of § 901(a)." *Id*. at 564, 104 S. Ct. 1211. Significantly, the Court found "no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the federal government are subject to regulation." *Id*. (citation omitted). The Court further emphasized that "by its all

---

[9]    Section 901(a), 20 U.S.C. § 1681(a), provided that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . . ." 28 U.S.C. § 1681(a).

inclusive terminology § 901(a) appears to encompass all forms of federal aid to education, direct or indirect. We have recognized the need to accord Title IX a sweep as broad as its language, and we are reluctant to read into § 901(a) a limitation not apparent on its face." *Id*. (citations, internal citations, and quotations omitted).[10]

The Borough asserts that *Grove City* is inapplicable to the instant dispute. Instead, the Borough argues that resolution of the "Federal funds" issue is controlled by the Supreme Court's decision in *United States Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597, 106 S. Ct. 2705, 91 L. Ed. 2d 494 (1986).

*Paralyzed Veterans* involved the prohibition on discrimination against qualified handicapped persons in any program or activity receiving federal financial assistance under Section 504 of the Rehabilitation Act of 1973 . *See Paralyzed Veterans*, 477 U.S. at 599, 106 S. Ct. 2705. Under the Airport and Airways Development Act of 1970, the United States provided financial assistance to airport operators. The Government also operated the nationwide air traffic control system. *See id*. The issue before the Court was "whether, by virtue of such federal assistance, § 504 is applicable to commercial airlines." *Id*.

The Court first emphasized that § 504 required identification of the recipient of the federal assistance, which involved consideration of the underlying grant statutes. *See id*. at 604, 106 S. Ct. 2705. After reviewing these grant statutes, the Court found that

---

[10]     The *Grove City* Court also held that the anti-discrimination language of § 901(a) was "program specific." *Grove City*, 465 U.S. at 570-71, 104 S. Ct. 1211. In other words, the prohibition on discrimination applied only to an institution's operation of the particular program that received federal funds. In response to this determination, Congress passed the Civil Rights Restoration Act of 1987 to broaden the definition of "program or activity" so that the anti-discrimination provisions would apply "institution-wide." Civil Rights Restoration Act of 1987, Pub. L. 100-259, 102 Stat. 28, note following 20 U.S.C. § 1687; *see also Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 551 F.3d 193, 200 (3d Cir. 2008) (explaining the passage of the Civil Rights Restoration Act of 1987 as a response to *Grove City* and its progeny).

Congress "made it explicitly clear that these funds are to go to airport operators. Not a single penny of the money is given to the airlines. Thus, the recipient for purposes of § 504 is the operator of the airport and not its users." *Id*. at 605, 106 S. Ct. 2705. Congress, according to the *Paralyzed Veterans* Court, imposed the obligations of § 504 only upon "those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id*. at 606, 106 S. Ct. 2705.

The Court also addressed and rejected the respondents' claim that the airlines were "indirect recipients" of the aid to airports. *See id*. The respondents' argument, which they claimed was consistent with *Grove City*'s recognition that federal financial assistance could be direct or indirect, confused "intended *beneficiaries* with intended *recipients*." *Id*. (emphasis in original). *Grove City*, as interpreted by the *Paralyzed Veterans* Court, "stands for the proposition that Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly," but it does not provide that federal coverage "follows the aid past the recipient to those who merely benefit from the aid." *Id*. at 607, 106 S. Ct. 2705. As a result, the college in *Grove City* and the airlines in *Paralyzed Veterans* were in two distinct positions. That is, in *Grove City* it was apparent "that Congress' intended recipient was the college, not the individual students to whom the checks were sent from the Government." *Id*. at 606-07, 106 S. Ct. 2705. This "unusual disbursement pattern of money from the Government through an intermediary . . . to the intended recipient" caused the *Grove City* Court to recognize that federal financial assistance could be indirectly received. *Id*. at 607, 106 S. Ct. 2507. *Paralyzed Veterans*, however, lacked a similar funding scheme or the indirect receipt of funds. Instead, it "[was] clear that the airlines [did] not actually receive the aid; they only benefit[ted] from the airports' use of the aid." *Id*. at 607, 106 S. Ct. 2705. The Court further found the airport operators to be in a different position as the students in *Grove City* and not "mere conduits of the aid" because the

airports were the intended recipients of the assistance. *See id*.

*Paralyzed Veterans* and *Grove City* thus instruct that "the recipient of that assistance" be identified. *Id*; *see also Smith v. NCAA*, 266 F.3d 152, 161 (3d Cir. 2001) ("intent of the grant-maker is not the only relevant consideration regarding whether an entity is an indirect recipient of federal financial assistance. Courts should also consider the degree to which the entity is able to control decisions made with respect to the money, the most important decision being whether the grant money should be accepted at all."); *Cureton v. NCAA*, 198 F.3d 107, 116 (3d Cir. 1999) ("the critical inquiry in determining whether an entity is an indirect recipient of Federal assistance is whether that entity is the intended recipient of Federal funds, intention being from Congress's point of view.")

Prior to resolving whether the Borough was the recipient or beneficiary of federal funding, it is necessary to address the Borough's contention that the "plain language in NAGPRA only speaks to direct recipients of federal funds." (Doc. 101, 8 (citing 25 U.S.C. § 3001(8)). This claim is simply not supported by the NAPGRA's statutory language or its regulations. The face of the statute makes clear that the NAGPRA does not differentiate between direct and indirect receipt of "Federal funds." Specifically, under § 3001, a "museum" is "*any* institution or State or local government agency (including any institution of higher learning) *that receives Federal funds . . . .*" 25 U.S.C. § 3001(8) (emphasis added). Just like the language "under any education program or activity receiving Federal financial assistance" in *Grove City*, 465 U.S. at 557 n.1, 104 S. Ct. 1211, there is nothing in the statute to support the Borough's claim that only "museums" receiving funds directly from the Federal Government are subject to regulation. Finding the indirect receipt of "Federal funds" sufficient to render an institution or state or local government agency a "museum" under the NAGPRA is also in harmony with its regulations. *See* 43 C.F.R. § 10.2(a)(3)(iii) ("receives Federal Funds" includes funds received after November 16, 1990 "through any

grant, loan, contract (other than a procurement contract), or other arrangement by which a Federal agency makes or made available to a museum aid in the form of funds."). The Borough's contention that the NAGPRA applies only to direct recipients of federal funding is without merit.

The evidence of record establishes that the Borough was the recipient of "Federal funds" since the enactment of the NAGPRA. For example, in 2009, under loan number 83119, the Borough obtained federal funds for a water meter replacement project administered by PENNVEST. (Doc. 98, Ex. 5, "068".) The Funding Offer, accepted by John McGuire on October 7, 2009, states: "Federal Participation: Funding Recipient agrees to inform all parties that this project is being supported in part by Federal funding . . . ." (*Id*. at Ex. 5, "018".) The Funding Agreement entered into by PENNVEST and the Borough states: "[t]his project will be funded in whole or in part with federal monies through the DWSRF and it has a Catalog of Federal Domestic Assistance (CFDA) number of 66.468." (*Id*. at Ex. 5, "054".) An exhibit to the Funding Agreement, entitled "Project Specific Terms," and referred to in the Funding Agreement under the provision "Funding Source," adds: "Grant: FLF ARRA- Federal Loan Forgiveness ARRA- Federal loan forgiveness using the American Recovery and Reinvestment Act 2009 fund." (Doc. 98, Ex. 5, "068".) The Borough Council, by Resolution No. 2009-9, approved the Funding Agreement, identifying itself as "Funding Recipient- Loan Number 83119" as part of its "Resolution to Accept Grant." (Doc. 103, Ex. 2, "067".) PENNVEST's records also indicate that the water replacement project received approval on July 21, 2009 for the amount of $1,219,854.00. The source was identified as "federal." (Doc. 98, Ex. 5, "001".) Moreover, Plaintiffs' evidence demonstrates that payment requests for loan number 83119 were submitted by the Borough and signed by Louise McCaffrey as the "Authorized Signature of Funding Recipient" for disbursement of funds pursuant to this grant. (Doc. 98, Ex. 6, "009", "011", "013", "015", "017", "019", "021", "023",

"025", "027", "029".) Corresponding documents identify these disbursements as ARRA "loan forgiveness AMT." (*Id*. at Ex. 6, "010", "012", "014", "016", "018", "020", "022", "024", "026", "028".) These documents directly correspond to bank statements and remittance sheets submitted by the Borough which show receipt and deposit of funds disbursed pursuant to loan number 83119. (Doc. 100, Ex. 3, at Ex. C thereto.) At the completion of the water meter project, Paul Marchetti of PENNVEST sent correspondence to Rich Cardamone of PENNVEST instructing him to "release holdback in the amount of $53,972.39." (Doc. 98, Ex. 15, "006".) The correspondence further states that "[t]his project was funded entirely with ARRA grant funds, . . ." (*Id*.)

The water meter replacement project evidence is not the only summary judgment evidence evincing the Borough as the recipient of "Federal funds." A letter from PEMA to the Borough indicates that "[t]he Federal Emergency Management Agency (FEMA) has approved Project Worksheet(s) (PW) under the Public Assistance Program for Summer Floods 2006, FEMA-1649-DR-PA" in the amount of $33,349.23. (Doc. 98, Ex. 6, "009".) A remittance advice for this amount was submitted by the Borough, indicating "PEMA INV #16496204 2 12 FEMA 1649 SUMMER 06 FLOODS." (Doc. 100, Ex. 3, at Ex. A thereto.) An invoice from PEMA to the Comptroller indicates that the entire invoice amount is "Federal Share." (Doc. 98, Ex. 6, "004".)

Moreover, on or about January 18, 2006, the Borough entered into a Bond Purchase Agreement for a $6,258,392.00 Guaranteed Water Revenue Bond with PENNVEST with loan M.E. No. 80133. (Doc. 98, Ex. 5, "079-084".) Exhibit 1-A to the Bond Purchase Agreement is entitled "Audit Requirements for Entities Receiving Federal Awards from Commonwealth." (*Id*. at "119".) PENNVEST's records indicate that the source of this loan was "federal." (*Id*. at "001".) Plaintiffs have also produced evidence evincing receipt of funds under loan M.E. No. 80133. (Doc. 98, Ex. 15, "005".) Based on this evidence,

Plaintiffs have demonstrated that the Borough was provided funds originating with the Federal Government for infrastructure projects since the enactment of the NAGPRA.

The Borough maintains, however, that it was not the intended recipient of the funding. It claims the funds were intended for the Commonwealth, not the Borough, and that only the Commonwealth was in the position to accept the funds identified by Plaintiffs. Essentially, the Borough contends that it, like the airlines in *Paralyzed Veterans*, was a mere beneficiary of federal aid.

The Borough's attempt to align itself with the airlines in *Paralyzed Veterans* is unavailing. For one, although the Borough claims that it did not have the opportunity to accept or reject the federal funds it received, this argument is contradicted by the evidence of record. As discussed, the Borough entered into funding and loan agreements identifying the Federal Government as the source of the funds. The evidence further confirms that the Borough Council applied for, authorized and accepted these funds. Thus, in contrast to the airlines in *Paralyzed Veterans*, the Borough was specifically in the position to reject federal funds if it wished to avoid compliance with civil rights laws such as the NAGPRA.

This case is also unique from *Paralyzed Veterans* in another key respect. There, the airlines did not receive "a single penny" of the federal assistance. Here, however, money was in fact given to the Borough and deposited into Borough accounts. The Borough did not simply benefit from funds originating with the Federal Government but spent by the Commonwealth, it actually received and spent federal funds. Thus, the Borough was not merely an intended beneficiary of federal assistance; it was the intended recipient of federal funding.

The relationship between the Commonwealth and the Borough is also unlike that between the airport operators and airlines in *Paralyzed Veterans*. In that case, it was apparent that the intended recipient of the funds were the airports, which prevented the

airport operators from being considered "conduits" of the aid. *See* 477 U.S. at 2712, 106 S. Ct. 2705. Conversely, the Commonwealth here was a "conduit" of federal funds made available for use by the Borough. For instance, with respect to the water meter replacement project, it is clear that the Borough was intended to receive federal funds under the ARRA. Even though these funds passed through PENNVEST before final deposit with the Borough, the Borough's identity as the recipient of that aid is apparent. In fact, the Funding Agreement Addendum addresses issues "applicable to ARRA funds provided through the Pennsylvania Infrastructure Investment Authority to Funding Recipients, hereinafter referred to as Contractors." (Doc. 98, Ex. 5, "060".) And, unlike in *Paralyzed Veterans*, Congress identified local governments such as the Borough as intended recipients of federal assistance under the American Recovery and Reinvestment Act. Specifically, the purposes of the ARRA include: "to preserve and create jobs and promote economic recovery"; "to assist those most impacted by the recession"; and "to stabilize State and local government budgets, in order to minimize and avoid reductions in essential services and counterproductive state and local tax increases." American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115.

The relationship between the Commonwealth and Borough is therefore much more akin to that between the students and college in *Grove City*. Notably, the Commonwealth and the students in *Grove City* served the same role with respect to the distribution of federal assistance- they were the vehicles by which the federal funds reached their final destinations. As in *Grove City*, "there is no basis in the statute for the view that only institutions that . . . receive checks directly from the federal government are subject to regulation." 465 U.S. at 564, 104 S. Ct. 1211.

Finding the Borough to have received federal assistance in this case is consistent with *Bentley v. Cleveland County Board of County Commissioners*, 41 F.3d 600 (10th Cir.

1994), a case relied on by Plaintiffs. In *Bentley*, the plaintiff alleged violations of § 504 of the Rehabilitation Act. *See id*. at 602. Prior to the commencement of the litigation, the defendant, the board of county commissioners, entered into an agreement with the Oklahoma State Department of Transportation pursuant to which the Department agreed to recommend the county to receive federal funds under the Federal Bridge Replacement and Rehabilitation Program. *See id*. The county commissioners all signed the agreement, and the county ultimately received the funds. *See id*. at 603. Nevertheless, the defendant, much like the Borough here, claimed that it was not covered by the applicable statute because "it received the funds indirectly from the State Department of Transportation." *See id*. at 603. The defendant, also like the Borough in this case, cited *Paralyzed Veterans* to support the proposition that only direct recipients of federal assistance were covered by the statute at issue. *See id*. at 604.

The United States Court of Appeals for the Tenth Circuit found the defendant's arguments unpersuasive. Specifically, the court noted that *Paralyzed Veterans* "did not hold that only direct recipients of federal funds were covered programs or activities, but rather made a distinction between recipients of federal funds and mere beneficiaries." *Id*. The court concluded that the defendant had the ability to accept or reject funds as the commissioners each "signed an agreement with the Oklahoma Department of Transportation that expressly sought federal funds. Thus, the Board knowingly requested and accepted federal funds and cannot avoid the accompanying obligation to comply with federal civil rights laws." *Id*.

*Bentley* provides persuasive support for concluding that the Borough was an intended recipient of "Federal funds." Indeed, the Borough entered into funding and loan agreements with PENNVEST for federal funds available under the ARRA. This is no different than the defendant in *Bentley* that signed an agreement with the Oklahoma State

26

Department of Transportation to receive federal funds under the Federal Bridge Replacement and Rehabilitation Program. *See Bentley*, 41 F.3d at 602-03.[11] The Funding Agreement signed by the Borough with PENNVEST identified that the project would "be funded in whole or in part with federal monies", contained a Funding Agreement Addendum captioned as "Implementation of the American Recovery and Reinvestment Act of 2009", and the Grant Amount of $1,219,854.00 was made as "Federal loan forgiveness using the American Recovery and Reinvestment 2009 fund." (Doc. 98, Ex. 5.) The evidence further establishes that the Borough Council approved the Funding Agreement by resolution and that the Borough received the funds. Thus, as in *Bentley*, the Borough's solicitation and acceptance of federal funds mandates its compliance with federal law.

Based on the evidence of record, Plaintiffs have demonstrated that the NAGPRA is applicable to the Borough of Jim Thorpe. Jim Thorpe's remains are covered by the NAGPRA, the Borough has possession or control over the remains,[12] and the Borough was the intended recipient of "Federal funds" since the enactment of the NAGPRA. Accordingly, the Borough is as a "museum" for purposes of the Native American Graves Protection and

---

[11] The Borough attempts to distinguish *Bentley* by arguing that the defendant there had a contractual relationship with the Federal Government. (Doc. 101, 7 n.8.) The Borough misreads *Bentley*. As is the case here, the *Bentley* defendants' contractual agreement for receipt of federal funds was with a state agency. *See Bentley*, 41 F.3d at 603-04.

[12] "Possession" under the regulations is defined as "physical custody of human remains, . . . with a sufficient legal interest to lawfully treat the objects as part of its collection for purposes of these regulations." 43 C.F.R. § 10.2(a)(3)(i). "Control" is similarly defined as "having a legal interest in human remains, . . . sufficient to lawfully permit the museum or Federal agency to treat the objects as part of its collection for purposes of these regulations whether or not the human remains, . . . are in the physical custody of the museum . . . ." *Id.* at § 10.2(a)(3)(ii). As Jim Thorpe's remains are buried on Borough owned land and within a monument maintained by the Borough, the "possession" or "control" requirement under the statute is readily satisfied.

Repatriation Act. Therefore, because it "receive[d] Federal funds," the Borough's cross-motion for summary judgment will be denied.

### c. The Doctrine of Laches Does Not Bar the NAGPRA Claims

Lastly, the Borough contends that it should be granted summary judgment based on its defense of laches. In support, the Borough relies on the fact that Plaintiffs waited fifty-five years since Jim Thorpe was buried in the Borough and twenty years since the enactment of the NAGPRA to commence litigation. The Borough also insists that it suffered prejudice as a result of the delay. Plaintiffs, however, reason that the defense of laches is inapplicable in this case because the delay was the result of the Borough's own unclean hands. Alternatively, Plaintiffs opine that the Borough failed as a matter of law to meet its burden to establish a laches defense.

The elements of the equitable defense of laches are "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *E.E.O.C. v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984). The burden of establishing it is on the defendant. *See id.* "As an equitable doctrine, the decision to apply laches is left to the sound discretion of the District Court." *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 134 (3d Cir. 2000) (citing *Gruca v. U.S. Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974)).

As to lack of diligence, the party's delay in bringing suit must be unreasonable. *See Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). "While statutes of limitations do not directly apply to equitable claims . . . , a limitations period on an analogous claim for legal relief is highly relevant to a laches analysis." *In re Mushroom Transp. Co.*, 382 F.3d 325, 337 (3d Cir. 2005). Accordingly, "'if a statutory limitations period that would bar legal relief has expired, then the defendant in an action for equitable relief enjoys the benefit of a presumption of

inexcusable delay and prejudice.  In that case, the burden shifts to the plaintiff to justify its delay and negate prejudice.'" *Id*. (quoting *Great Atl.*, 735 F.2d at 80).  In cases like this where the federal statute "does not specify a statute of limitation, courts must 'adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so.'" *Santana Prods.*, 401 F.3d at 135 (quoting *Wilson v. Garcia*, 471 U.S. 261, 266-67, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)); *see also Warner v. Sun Ship, LLC*, No. 11-7830, 2012 WL 1521866, at *3 (E.D. Pa. Apr. 30, 2012) ("In cases such as this one, where the statute does not contain a limitations period, the Court begins its analysis by looking to the most analogous state statute of limitations to determine whether the presumption of laches attaches.").

Adoption of a time limit for Plaintiffs' NAGPRA claims would be inconsistent with the statute because, as explained during the rulemaking process:

> One commenter proposed inclusion of a ten year time limit during which Indian tribes must make claims for repatriation.  Time limits for claims were discussed by Congress when the bill was being considered but were not included in the Act.  Inclusion of such time limits in the regulations would contradict Congressional intent.

NAGPRA Regs., 60 Fed. Reg. 62,134, 62,155 (Dep't of Interior Dec. 4, 1995).  The Borough, therefore, retains the burden of establishing unreasonable delay and prejudice.

With respect to the period of delay, the relevant period did not commence until 1990, the time with which the NAGPRA was enacted.  Plaintiffs waited nearly twenty years thereafter to seek relief under the NAGPRA.  Whether this delay was "unreasonable" need not be resolved, however, because the Borough has not met its burden of demonstrating prejudice as a result of the delay.

"The essential element of laches is prejudice; the party asserting the defense must show that it has suffered some significant injury from the delay in the claim being brought." *In re Sheckard*, 394 B.R. 56, 66 (E.D. Pa. 2008).  "'To establish prejudice, the

party raising laches must demonstrate that the delay caused a disadvantage in asserting and establishing a claimed right or defense; the mere loss of what one would have otherwise kept does not establish prejudice.'" *In re Mushroom Transp. Co.*, 382 F.3d at 337 (quoting *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir. 1999)). Stated differently, the party must "show that some change in the condition or relations of the parties occurred during the period in which the plaintiff unreasonably failed to act." *Appel v. Kaufman*, 728 F. Supp. 2d 684, 698 (E.D. Pa. 2010) (citing *Leedom v. Thomas*, 473 Pa. 193, 373 A.2d 1329 (1977)). "Prejudice can arise through the death of the principal participants in the transactions complained of, the death of witnesses or witnesses to the transactions, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible." *Id*. (citing *In re Wallace's Estate*, 299 Pa. 333, 149 A. 473, 475 (1930); *Kern v. Kern*, 892 A.2d 1, 10 (Pa. Super. 2005)).

Here, the prejudice claimed by the Borough is insufficient to establish a defense of laches. The Borough's claimed prejudice includes: reliance on the agreement with Patricia Thorpe; changing of street signs in the Borough; provision of a suitable site for Jim Thorpe's remains for fifty-five years at the expense of revenue from real estate taxes; maintenance of the site during this time period by removing trash, cutting grass, and plowing snow; and renaming Mauch Chunk and East Mauch Chunk as "the Borough of Jim Thorpe." (Doc. 96, 14-15.) However, these actions in no way suggest that the delay caused a disadvantage to a claimed defense under the NAGPRA. *See, e.g., Miller v. Richland Twp.*, No. 000-6080, 2001 WL 1496207, at *5 (E.D. Pa. Nov. 21, 2001) (continued output of money on business is not sufficient to establish prejudice).[13]

---

[13]     The Borough seemingly implies that Plaintiffs are seeking to have the Borough stripped of its identity as "the Borough of Jim Thorpe." As stated by Plaintiffs,

In its reply to Plaintiffs' opposition brief to its summary judgment motion, the Borough also suggests it was prejudiced in its defense of this action due to Plaintiffs' delay as witnesses died and memories of living witnesses faded. But, these occurrences did not prejudice the Borough in this case. Significantly, the testimony of these witnesses would not have impacted the material determination in this case. That is, the Borough's status as a "museum" for purposes of the NAGPRA did not depend on the testimony of witness such as Grace Thorpe, the half-sister of Richard and William Thorpe. As such, the loss of potential witnesses did not disadvantage the Borough in defending against Plaintiffs' claims under the NAGPRA.[14]

The Borough has failed to make the necessary showing of prejudice to avail itself of the defense of laches in this case. Thus, the doctrine of laches will not be applied.

Accordingly, as Plaintiffs have established that the Borough is a "museum" under the NAGPRA, and the Borough has failed to meet its burden demonstrating the applicability of laches to the instant action, Plaintiffs are entitled to a declaration as to the applicability of the NAGPRA to the Borough. Plaintiffs' motion for summary judgment will be granted.

### III. Conclusion

Given that Jim Thorpe's widow made an agreement with the municipalities to inter his body there in exchange for them naming their jointure Jim Thorpe, the result here may seem at odds with our common notions of commercial or contract law. Congress, however,

---

they have not sought a change in the Borough's name, demolition of the monument at Jim Thorpe's grave, or replacement of any signage in the Borough.

[14] Plaintiffs also claim that the doctrine of laches does not provide the Borough a defense due to the Borough's unclean hands. As the Borough has failed to establish that it was prejudiced by Plaintiffs' delay in filing suit, I make no determination as to whether the doctrine of unclean hands applies to the Borough.

recognized larger and different concerns in such circumstances, namely, the sanctity of the Native American culture's treatment of the remains of those of Native American ancestry. It did so against a history of exploitation of Native American artifacts and remains for commercial purposes. The Native American Graves Protection and Repatriation Act recognizes the importance of compliance with Native American culture and tradition where dealing with the remains of one of Native American heritage, and this is a case which fits within the reach of this congressional purpose.

Moreover, any concern about the loss of identity of the municipality of Jim Thorpe is misplaced. As noted, no relief in the form of the elimination of the name is sought by Plaintiffs. Therefore, the existence of the municipality of Jim Thorpe will continue.

Based on the analysis of this Memorandum, the "probate exception" to federal jurisdiction is inapplicable to the instant litigation and does not prevent the Court from entertaining Plaintiffs' claims. Additionally, the Borough has "receive[d] Federal funds" since the enactment of the Native American Graves Protection and Repatriation Act and is a "museum" for purposes of the statute. Lastly, the Borough's defense was not prejudiced as a result of Plaintiffs' delay in commencing this action. Therefore, the Borough's motion and cross-motion for summary judgment will be denied and Plaintiffs' motion for summary judgment will be granted.

An appropriate order follows.


April 19, 2013          /s/ A. Richard Caputo
Date                A. Richard Caputo
                  United States District Judge